Troy P. Foster #017229
Haley R. Carr #035804
**The Foster Group, PLLC**
902 W. McDowell Road
Phoenix, Arizona 85007
Tel: 602-461-7990
tfoster@thefosterlaw.com
hcarr@thefosterlaw.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Matthew D. Pinard, an individual,<br><br>Plaintiff,<br><br>v.<br><br>Bausch and Lomb, Inc., a New York corporation,<br><br>Defendant. | Case No.:<br><br>SEALED<br>**COMPLAINT**<br><br>**(Jury Trial Demanded)** |

For his Complaint against Bausch and Lomb, Inc. (the "Company" or "B&L"), Plaintiff Matthew D. Pinard ("Plaintiff" or "Mr. Pinard") alleges as follows:

**FACTUAL ALLEGATIONS**

**Parties and Jurisdiction**

1. Plaintiff currently resides in and is a citizen of Yavapai County, Arizona.

2. At all times relevant to this Complaint, Plaintiff worked for B&L.

3. B&L is a corporation that is authorized to conduct and is conducting business in Arizona.

4. Plaintiff worked for B&L as a sales representative from April 11, 2014 to June 15, 2017.

5. B&L is a *person* as that term is used in the False Claims Act ("FCA") (31 U.S.C. §§ 3729–3733).

1

6. Plaintiff is a *person* as that term is used in the FCA.

7. Jurisdiction and venue are proper in this Court.

**Corporate Structure / Entities Involved in Underlying Fraud**

8. B&L is a subsidiary of Bausch Health Companies, Inc. ("BHC").

9. BHC is a Canadian company that manufactures health care products.

10. As the ophthalmology division of BHC, B&L is an eye-health company that sells products such as contacts lenses, lens care products, and eye surgery products.

11. Prior to 2018, BHC was known as Valeant Pharmaceuticals International Inc. ("Valeant").

12. At all times Plaintiff worked for B&L, BHC was known as Valeant.[1]

13. The fraudulent conduct on which this Complaint is based involves a conspiracy between an executive at Valeant and an executive at Philidor Rx Services LLC ("Philidor").

14. Philidor was a Delaware limited liability corporation with its principal place of business in Hatboro, Pennsylvania.

15. Philidor was a Specialty Pharmacy.

16. A Specialty Pharmacy is a pharmaceutical delivery system that typically specializes in the delivery of high-cost and/or complex drugs, or drugs that treat complex conditions.

17. Valeant hired Gary Tanner in 2012 to oversee its alternative fulfillment ("AF") program, which frequently utilized and relied on Specialty Pharmacies for delivering drugs.

18. Upon information and belief, in or around 2012, Mr. Tanner had discussions with Andrew Davenport about creating a Specialty Pharmacy.

---

[1] For clarification, this Complaint refers to the Company as "Valeant" when discussing acts committed prior to the 2018 name change; it refers to the Company as "BHC" when discussing acts committed after the 2018 name change.

2

19. Upon information and belief, Mr. Tanner subsequently discussed the possibility of creating a Specialty Pharmacy with other Valeant executives.

20. In 2013, Mr. Davenport founded Philidor with the help of Mr. Tanner and Valeant.

21. Valeant committed both funding and personnel to Philidor at the time of its founding.

### Philidor and Valeant Conspire to Commit Fraud

22. From its creation, Philidor was primarily used to increase Valeant sales and provide a windfall to Mr. Tanner and Mr. Davenport.

23. In 2014, Mr. Tanner violated his fiduciary duties to Valeant when he conspired with Mr. Davenport to persuade Valeant to purchase an option to buy Philidor for approximately $100 million.

24. Out of the $100 million purchase price, approximately $40 million went to Mr. Davenport, who in turn shared a portion with Mr. Tanner.

25. The fraudulent conduct relevant to this Complaint stems from Valeant's and Philidor's effort to increase sales of Valeant brand-name drugs during Plaintiff's employment.

26. To increase sales of Valeant brand-name drugs: (i) Philidor employees were directed to fraudulently change prescriptions, and (ii) employees of Valeant—and by extension employees of its subsidiary B&L—were instructed to pressure doctors and other medical providers to prescribe Valeant brand-name drugs (which would be filled through Philidor) for off-label uses.

27. A portion of the fraudulent prescriptions for Valeant brand-name drugs were paid for through Medicare and/or Medicaid.

28. Philidor shut down in November 2015, but B&L's policy of pushing providers to prescribe Valeant brand-name drugs for off-label uses continued, and Plaintiff's work remained the same.

3

**Plaintiff's Connection to the Fraud Perpetrated Through B&L**

29. While Plaintiff worked at B&L, he was pressured by his supervisors to persuade providers to prescribe Valeant brand-name drugs for off-brand uses.

30. For example, one of the drugs Plaintiff promoted was Besivance, which is approved to treat bacterial conjunctivitis.

31. A typical high-volume eye surgeon performs cataract surgery ten to thirty times per month but sees a patient with conjunctivitis only one or two times per month.

32. Plaintiff's supervisors pressured him to persuade eye surgeons to prescribe Besivance for post-cataract-surgery care to prevent endophthalmitis because eye surgeons need to prescribe medication to treat endophthalmitis much more often than they need to prescribe medication to treat conjunctivitis.

33. Besivance is not approved to treat endophthalmitis.

34. Plaintiff refused to promote off-label uses of Valeant drugs to increase sales of Valeant drugs—which were ultimately filled through Philidor when it was open.

**Textbook Retaliation**

35. Plaintiff was reprimanded and disciplined as a result of his refusal to promote off-label use of Besivance and because he voiced concerns about the pressure to illegally promote Valeant drugs.

36. For example, in a May 24, 2017 memorandum from his supervisor Jennifer O'Neil, Plaintiff was told that "the negative comments you have made pertaining to Valeant have raised concerns. These comments are not appropriate, nor are they beneficial to moving forward and addressing the concerns I've expressed to you."

37. On July 11, 2017, after conversations with supervisors did not result in a change of policy, Plaintiff emailed Valeant's legal counsel to report that he felt pressured to promote off-label uses of Besivance.

38. The following week Plaintiff had a meeting with his Regional Director, District Manager, and Human Resources Manager to discuss his perceived performance deficiencies.

39. Plaintiff's performance deficiencies were directly related to his refusal to push off-label use of Valeant drugs like Besivance.

40. B&L's policy of pushing off-label uses of Valeant drugs stemmed from the fraud and conspiracy perpetrated between Valeant and Philidor executives.

41. B&L terminated Plaintiff on June 15, 2017, just four days after he reported to counsel that he felt pressured to promote off-label use of Valeant drugs.

**Plaintiff Discovers the Retaliatory Intent Behind His Termination**

42. Before Plaintiff's termination, on or around November 17, 2016, Mr. Tanner and Mr. Davenport were arrested for conspiracy to commit fraud and money laundering, among other things.

43. After Plaintiff's termination, on or around October 30, 2018, Mr. Tanner and Mr. Davenport were sentenced for their crimes connected to the fraud.

44. Plaintiff did not discover the retaliatory intent behind his termination until the convictions and the full details of the fraud and conspiracy were released.

45. Once the full details of the conspiracy were released, Plaintiff grasped exactly how Mr. Tanner and Mr. Davenport colluded to increase sales of Valeant drugs; it was then that Plaintiff realized that both (i) the concerns he had raised to his supervisors, and (ii) the alleged deficiencies in his performance were directly related to the fraud and conspiracy perpetrated by Mr. Tanner and Mr. Davenport.

**LEGAL CLAIMS**

**Count One: False Claims Act - Retaliation**

46. Plaintiff realleges and incorporates by reference paragraphs 1-45 as if fully set forth herein.

47. The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §1395 *et seq.*, (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services through the Centers for Medicare and Medicaid Services ("CMS"). Medicare was designed to be a

health insurance program and to provide for the payment of hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify under the terms and conditions of the Medicare Program.

48. Reimbursement for Medicare claims is made by the United States through CMS which contracts with private insurance carriers to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395u. In this capacity, the carriers act on behalf of CMS.

49. The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (hereafter "Medicaid"), is a Health Insurance Program administered by the United States and the various individual States and is funded by State and Federal taxpayer revenue. The Medicaid Program is overseen by the United States Department of Health and Human Services through CMS. The States directly pay providers, with the States obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30 (1994). Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.

50. The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired and deceased members. The program is administered by the Department of Defense and funded by the Federal Government. CHAMPUS pays for, among other items and services, prescription drugs for its beneficiaries.

51. The federal government, through its Departments of Defense and Veterans Affairs, also maintains and operates medical facilities including hospitals, and receives and uses federal funds from prescription drugs for patients treated at such facilities and otherwise. In addition, under the Public Health Service Act, the Section 340B Drug Pricing Program, and the Veterans Health Care Act of 1992, the federal government directly or

indirectly provides funds to certain other federal agencies and to state and local facilities and programs, including to non-profit disproportionate share hospitals ("DSH") and Federally Qualified Health Centers ("FQHCs"). *See* 38 U.S.C. § 8126.

52. The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, prescription drugs for its beneficiaries.

53. The False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A), makes "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval a violation of federal law for which the United States may recover three times the amount of the damages the government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

54. The FCA, 31 U.S.C. § 3729(a)(1)(B), makes "knowingly" making, using, or causing to be used or made a false record or statement material to a false or fraudulent claim paid or approved by the Government a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of $5,500 and $11,000 per claim.

55. The FCA, 31 U.S.C. § 3729(a)(1)(C), makes any person who conspires to commit a violation of the FCA liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,500 and $11,000 per claim.

56. The FCA, 31 U.S.C. § 3729(a)(1)(G), makes any person who "knowingly" makes, uses or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of $5,500 and $11,000 per claim.

57. The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property

which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. *See* 31 U.S.C. § 3729(b)(2).

58. Physicians and hospitals enter into Provider Agreements with CMS in order to establish their eligibility to seek reimbursement from the Medicare Program. As part of that agreement, without which the hospitals and physicians may not seek reimbursement from Federal Health Care Programs, the provider must sign the following certification:

"I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare." *See* Form CMS-855A; Form CMS-8551.

59. In addition, the claims themselves, as submitted, contain a similar certification. *See, e.g.,* Form CMS-1500.

60. When a provider submits a claim for payment, he or she does so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law.

61. In the case of Medicaid, each State's Medicaid Program's applicable certifications also incorporate relevant state law.

62. As outlined below, several states have passed legislation that closely tracks the FCA: California False Claims Act, Cal. Gov't Code § 12650 et seq., Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, § 1201 et seq., District of Columbia Procurement Reform Amendment Act, D.C. Code § 2-308.13 et seq., Florida False Claims Act, Fla. Stat. § 68.081 et seq., Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 et seq., Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 et seq., Louisiana Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. c. 3, sec. 437.1 et

seq., Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, § 5A et seq., Nevada False Claims Act, Nev. Rev. Stat. § 357.040 et seq., Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq., Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Chapter 32, § 36.002 et seq., Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq., Va. Code Anno. 49-4-168 et seq.; Indiana, IC 5-11-5.5; Michigan Medicare False Claims Act, MI ST Ch. 400, 400.602 et seq.; New Hampshire False Claims Act, N.H. RSA §§ 167:61-b et seq.; New Jersey False Claims Act, Sec. 2A:32C-1 et seq.; New Mexico Fraud Against Taxpayers Act, N.M. LEGIS 49 (2004 AND 2007) Chap. 4; New York State False Claims Act, 2007 New York Laws 58, Sec. 39, Article XIII, Sec. 189(a) et seq.; Oklahoma Medicaid False Claims Act, 2007 OK. ALS 137; Rhode Island False Claims Act, Sec. 9-1.1-1 et seq.; Wisconsin False Claims for Medical Assistance Act, Chapter 20, Subchapter 91, 20.931. These State False Claims Acts apply to the state portion of Medicaid fraud losses caused by false Medicaid claims to the jointly federal-state funded Medicaid program.  Each of the statutes listed above contains qui tam provisions governing a relator's right to claim a share of the State's recovery.

63.     Furthermore, the FCA, 31 U.S.C. § 3730(h), provides relief to employees who have been retaliated against in their employment because of lawful acts done by the employee in furtherance of efforts to stop one or more violations of the FCA.  Such retaliation may include discharge, demotion, suspension, threats, harassment, or any other type of discrimination in the terms and conditions of employment.  The employee is entitled to all relief necessary to make that employee whole, including reinstatement, two times back pay, interest on the back pay, and compensation for any special damages, including litigation costs and reasonable attorney's fees.

64.     Plaintiff reasonably believes that Defendant violated the Federal and State FCAs by engaging in the following alleged conduct:

a.     Conspiring to make and use false records and statements to get false claims paid by the Government;

  b. Conspiring to defraud the Government by getting false or fraudulent claims allowed or paid by the Government in furtherance of the object of the conspiracy, which was to promote and increase sales;

  c. Conspiring to illegally sell prescription drugs for off-label uses, which was to promote and increase sales;

  d. Retaliating against Plaintiff; and

  e. Other unlawful activities as described in this Complaint.

65. Plaintiff reasonably believed, and still believes, that Defendant's conduct violated the FCA and other Federal and State laws.

66. Plaintiff reported his beliefs that the Company was engaged in unethical and illegal behavior. Specifically, he alleged that supervisors were pressuring him to sell Valeant brand-name drugs for off-label uses.

67. This reporting was Plaintiff's effort to stop conduct that was part of a conspiracy that constituted a violation of the FCA.

68. As a result of engaging in the protected activity, Plaintiff was terminated.

69. The Company's conduct violated the anti-retaliation provision of the FCA. *See* 31 U.S.C. § 3730(h)(1).

70. As a result, Plaintiff is entitled to relief as outlined in 31 U.S.C. § 3730(h)(2), including back pay, double damages, compensatory damages, special damages, and attorneys' fees and costs.

## **Conclusion**

**THEREFORE**, Plaintiff respectfully requests the following relief:

A. A judgment in his favor against Defendant;

B. Full damages to be determined at trial;

C. Reasonable attorneys' fees and costs;

D. Pre- and post-judgment interest on award; and

E. All other appropriate equitable relief.

**DATED** this 15th day of September, 2020.

**The Foster Group, PLLC**

   */s/   Troy Foster*
Troy Foster
Haley Carr
902 W. McDowell Road
Phoenix, Arizona 85007
*Counsel for Plaintiff*